In re: **KINDRED HEALTHCARE, INC. SECURITIES LITIGATION**

No. **CIV.A.3:02CV–600–H.**

United States District Court,
W.D. Kentucky,
at Louisville.

Jan. 9, 2004.

Carl D. Frederick, Seiller & Handmaker, Louisville, KY, Helen J. Hodges, Kathleen A. Herkenhoff, Ramzi Abadou, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for Massachusetts State Carpenters Pension Fund.

Ronald R. Parry, Rene Heinrich, Parry, Deering, Futscher & Sparks, Covington, KY, for Paula Hillenbrand.

Charles G. Middleton, III, B. Ballard Rogers, Middleton & Reutlinger, Louisville, KY, Marc A. Topaz, Schiffrin, Craig & Barroway, Bala Cynwyd, PA, Paul J. Geller, Shepherd & Geller, Boca Raton, FL, for Mark Ramsdell.

Herbert L. Segal, Segal Stewart Cutler Lindsay Janes & Berry PLLC, Louisville, KY, Ira M. Press, Mark Strauss, Kirby McInerney & Squire, LLP, New York, NY, for Eastside Holdings, Ltd.

Beverly R. Storm, Arnzen & Wentz, Covington, KY, Sandy A. Liebhard, New York, NY, for Maryln W. Buck.

Alexander R. Sussman, Barry G. Sher, David B. Hennes, Sarah F. Warren, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, David Tachau, Scott T. Dickens, Tachau, Maddox, Hovious & Dickens PLC, Louisville, for Defendants.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

The Massachusetts State Carpenters Pension Fund and the Massachusetts State Carpenters Guaranteed Annuity Fund (collectively the "Fund") filed this class action in October 2002 under §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b), 78t(a), and accompanying securities regulation, 17 C.F.R. § 240.10b–5. Three other Plaintiffs also filed suit under the 1934 Act against Kindred Healthcare, Inc. ("Kindred") and five of its officers and directors. Plaintiffs allege that (1) Defendants misstated financial data about Kindred and failed to disclose important information about the status of Kindred's reserves to cover professional liability claims, which later proved to be inadequate and caused the value of Kindred's stock to drop, and (2) the individual officers and directors of Kindred are jointly and severally liable for the company's fraudulent actions as controlling persons of Kindred.

In January 2003, the Court consolidated all four actions, appointed the Fund and another member of the class action, Delta Partners, as lead Plaintiffs, and also appointed lead and liaison counsel for Plaintiffs. In March, Plaintiffs filed their consolidated complaint. In late May, Defendants followed with the pending motion to dismiss. The Court has thoroughly reviewed the record and the competing memoranda. Both parties have presented their arguments in a hearing held in chambers. The Court is therefore confident that it has all of the information necessary to reach its decision.

Having carefully considered the arguments on both sides, the Court concludes that Plaintiffs have not alleged sufficient facts to show that Defendants omitted material information or created a strong inference of the requisite scienter when Defendants allegedly misrepresented information to investors. The Court will sustain Defendants' motion to dismiss.

## I.

In April 2001, Vencor, Inc., a long-term health care provider, re-emerged from bankruptcy as Kindred. Its stock began trading again at that time. Kindred, based in Louisville, is one of the largest national providers of long-term health care services. It has two divisions: (1) a health services division that provides long-term care services through nursing centers and rehabilitation therapy, and (2) a hospital division. Kindred operated a significant number of facilities in Florida.

A focal point of this litigation concerns tort reform legislation that the Florida state legislature enacted in response to large damage awards which caused many insurance companies to stop writing medical malpractice insurance policies in the state. The law became effective May 15, 2001 and limited the amount of punitive damages for claims accruing after May 15. Under the law, plaintiffs had until October 5, 2001 to file lawsuits on claims accruing before May 15. Kindred was aware that the tort reform legislation might cause an increase in the number of professional liability lawsuits filed before October 5 because claimants could take advantage of the more liberal damages provisions under the old law. Plaintiffs report that at least 268 new claims were filed between November 30, 2000 and October 9, 2001. This increase in lawsuits could mean greater financial exposure for Kindred.[1]

To cover its professional liability claims, Kindred created a wholly-owned subsidiary named Cornerstone dedicated to providing Kindred insurance coverage. Prior to November 30, 2000, Cornerstone covered up to $2 million per professional liability claim with a $40 million annual aggregate limit for all claims. A third-party insurance company provided coverage for claims exceeding the $2 million per occurrence limit and for aggregate liabilities exceeding $40 million. For claims incurred after November 30, 2000, Kindred still maintained coverage per claim exceeding the $2 million per occurrence limit, but the third-party insurance company no longer provided excess coverage above the $40 million aggregate for policies that included Florida claims. When the total rose above $40 million, Cornerstone, and thus Kindred, were therefore left financially exposed to more Florida claims, which were potentially high because lawsuits filed before October 5, 2001 were not subject to caps on damages passed under the tort reform legislation.

Beginning December 31, 2000, Kindred continued to increase its reserves for future tort liability. It also reported solid earnings through the third quarter of 2001. On November 14, 2001, Kindred completed a secondary offering of its shares in which the individual Defendants sold a total of 524,000 shares for approximately $24 million. According to Plaintiffs' calculation, these Defendants retained about 80% of their shares.[2] The individual Defendants also received lucrative performance-based compensation bonuses during this time.

During 2002, Kindred continued to report solid economic growth each quarter. It told investors that it was satisfied with its liability coverage, including its liability reserves for Florida claims. Its stock was reviewed favorably and listed as a "buy"

---

1. Whether Kindred's actual exposure from existing lawsuits increased during the same period would depend on the net effect of subtracting liabilities settled, paid, or dismissed and adding the estimated liability attributable to the new cases.

2. Defendants estimate that company officers involved in the secondary offering retained about 90% of their total shares.

by stock analysts. At the end of the second quarter in 2002, one of Kindred's competitors, Beverly Enterprises, announced a $43 million charge to cover its professional liabilities based on a semi-annual actuarial review. Kindred stated that it did not need to increase its reserves based on its regular quarterly actuarial analysis. On October 10, 2002, however, Kindred announced a $55 million charge for the third quarter of 2002 to increase its reserves for professional liability claims, much of which was related to Kindred's Florida operations.[3] As a result, the stock price dropped by approximately forty per cent shortly thereafter and was downgraded by stock analysts from its "buy" status.

## II.

Rule 9(b) requires a plaintiff to plead "the circumstances constituting fraud or mistake . . . with particularity." The Private Securities Litigation Reform Act of 1995 ("PSLRA") raised the pleading standard for securities fraud cases. A plaintiff is now required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

The Court should dismiss a complaint only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (internal quotation marks omitted). This pre-PSLRA standard "gave the plaintiff the benefit of *all* reasonable inferences." *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (6th Cir.2001) (alteration in original) (internal quotation marks omitted). But, in the Sixth Circuit, the "strong inference" requirement under the PSLRA "means that plaintiffs are entitled only to the *most plausible* of competing inferences." *Id.* (emphasis added).[4]

---

**3.** Kindred reported that $25 million was attributable to claims arising in 2001 and $30 million was attributable to claims arising in the first nine months of 2002. Kindred reported that the increase resulted from an increase in the average expected cost per claim and that the total number of claims remained relatively unchanged.

While the rise in Florida claims is largely blamed for the $55 million charge, the Court notes that a large portion of the $55 million charge was probably attributable to claims accruing after May 15, 2001 given that $30 million was attributable to 2002 claims. Those 2002 claims were subject to the 75–day notice provision and damages caps under the tort reform law, which would presumably have given Kindred some advance notice of those claims and presumably led to lower overall average liability.

But even if a portion of the claims constituting the $55 million charge were subject to the 75–day notice provision, the Court does not find that the notice provision would have much impact. It is not clear to the Court that the notice provision offered the Defendants any more information about potential claims

than they would have had without 75 days notice. Setting reserve levels based on future projections of liabilities is an inherently uncertain exercise. Furthermore, reserve levels are subject to change as cases conclude and companies revise their estimates. Adjusting reserves based on the mere notice of a claim would be inherently less reliable than reserves based on an actual lawsuit.

The $55 million charge could have been a correction of inaccurate estimates from past quarters, or it could have been a proper increase justified at the time by a rise in claims costs. Kindred's precise liability for claims would necessarily be very difficult to predict before those cases have been litigated to conclusion or settled. Moreover, one cannot assume that the October 2002 reserve estimate was any more or less accurate than the estimate for the three months before or, for that matter, the three months afterwards.

**4.** Other circuits have held differently. *See, e.g., Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1187–88 (10th Cir.2003) ("[W]hile we will draw no inferences unfavorable to plaintiffs, we will likewise refuse to draw inferences in

■ The PSLRA, however, did not change the general rule that the court will draw inferences in favor of the plaintiff. *Id.* As always, the court must construe the facts in the light most favorable to the plaintiff and must assume that all facts alleged by the plaintiff are true. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998). The court "will indulge plaintiffs' inferences of fraud—provided, of course, those inferences leave little room for doubt as to misconduct." *Helwig*, 251 F.3d at 553. But the plaintiff must offer "more than the bare assertion of legal conclusions." *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir.1997) [hereinafter *In re Sofamor Danek*] (internal quotation marks omitted). The Court does not have to accept "as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987).

■ In reaching its decision, the Court has carefully reviewed the attachments to the briefs of both parties. Generally speaking, the courts do not consider matters outside the pleadings when ruling on a motion to dismiss. *Hammond v. Bald-*

*win*, 866 F.2d 172, 175 (6th Cir.1989). In this case, however, the Court reviewed and considered exhibits attached to Defendants' motion that contained copies of documents filed with the SEC and press releases specifically cited in Plaintiffs' complaint. For this reason, the Court believes that use of these documents was proper. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997) (taking into account those exhibits attached to defendant's motion to dismiss that were cited in the complaint and were central to plaintiff's claim). Any documents issued outside the class period or not cited in Plaintiffs' complaint were not used in writing this opinion.

## III.

■ To state a claim for securities fraud under § 10(b) of the 1934 Act and the PSLRA, Plaintiff must allege with particularity: (1) that Defendants made false statements concerning a material fact or omitted a material fact related to the purchase or sale of securities, "upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury,"[5] and

---

the plaintiffs' favor when doing so would allow them to make allegations 'on information and belief' without satisfying the particularity requirements of the [PSLRA]."); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 n. 6 (8th Cir.2002) (declining to adopt Sixth Circuit view); *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002) ("[W]hen determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002) ("Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter.").

5. The Court finds that the information about Kindred's liability reserves and its financial figures are material facts because, under the standard set forth by the Supreme Court, Plaintiffs would have viewed Defendants' misstatement or disclosure "as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotation marks omitted); *see also In re Sofamor Danek*, 123 F.3d at 400. Ensuring that Kindred had adequate reserves to cover professional liability claims was very important to the financial health of the company and thus to the value of Plaintiffs' stock in Kindred. Had Kindred been able to estimate the amount needed in its reserves more accurately, then presumably Kindred would not have had to announce such a significant charge in October 2002 and

(2) "facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter.[6] 15 U.S.C. § 78u–4(b); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir.1999) [hereinafter *In re Comshare*].

The Court is reminded that

"Plaintiffs' central allegation is that defendants were in charge of setting Kindred's reserves for professional liability claims and had 75–day advance notice throughout the Class Period of the size and amount of claims that would be filed

the effect on Kindred's stock price would not have been so drastic.

The Court also finds that Plaintiffs justifiably relied upon Defendants' statements and that the alleged misinformation about Kindred's reserves proximately caused Plaintiffs' injury. Plaintiffs cite alleged misstatements and omissions in routine filings with the Securities and Exchange Commission ("SEC"), company press releases, and stock analyst reports, public documents upon which investors would be expected to rely for information about company securities. The alleged misstatements and omissions about Kindred's reserves also proximately caused Plaintiffs' injury because once the inadequacy of its reserves was revealed in October 2002, Kindred's stock value, and thus the value of Plaintiffs' investments, dropped dramatically.

6. The PSLRA did not change the substantive law as to the scienter required to show securities fraud. Rather, the law raised the pleading requirements for showing the defendant's state of mind. *Helwig*, 251 F.3d at 548; *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548–49 (6th Cir.1999); *see also supra* Part II.

7. The failure to follow the GAAP does not suffice to support an independent claim under the 1934 Act. *In re Comshare*, 183 F.3d at 553. The GAAP are set forth by the Financial Accounting Standards Board in its Statement of Financial Accounting Standards ("FAS"). Specifically, Plaintiffs allege that Kindred did not accrue sufficient charges as required under FAS No. 5 if (1) information available to the company indicated that Kindred had incurred a liability at the date of the financial statements and (2) the liability could be reasonably estimated. Plaintiffs allege that Defendants met the first condition because the

in Florida, yet knowingly and/or recklessly failed to adequately reserve for those claims in order to avoid negative impact to Kindred's operating income." Introduction, Plaintiffs' Substituted Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss, at i.

Their charge that Kindred misstated its financial figures by not following generally accepted accounting principles (the "GAAP")[7] is basically the flip side of the

number of claims filed in Florida increased dramatically by October 2001 and Kindred's insurance coverage changed, thereby increasing its exposure to liability claims. Plaintiffs assert that the second condition is met because Kindred has a "sophisticated financial information system" and it had 75 days notice under Florida law that a liability suit was going to be filed.

First, Plaintiffs do not explain how it is significant that 268 liability lawsuits were filed in Florida against Kindred by the October 2001 deadline. Without any basis for comparison to know whether 268 represented a large increase in the number of liability claims filed under the old law, the number cannot be significant. It is just as logical that if more cases were filed earlier to meet the deadline, fewer cases would be filed later. In its financial statements, Kindred informed investors about the potential for an increase in Florida claims but that, ultimately, it was unsure what effect the new law would have on litigation in Florida.

Second, while it is true that Kindred's exposure to liability claims in Florida potentially increased after its insurance coverage changed—a fact about which Kindred informed its investors, it does not necessarily follow that Kindred's anticipated liabilities can be "reasonably estimated." Kindred did increase its reserves throughout the class period. Kindred based its estimates for its reserve levels on past claims experience, and there is no allegation that Defendants falsified this data. Defendants cannot be expected to predict future activity.

Third, Plaintiffs mischaracterize the significance of the 75–day notice provision under

allegation that Kindred failed to disclose the rise in Florida claims and the inadequacy of its liability reserves. Kindred's failure to accrue sufficient charges to income to cover its liability claims—the alleged violation of the GAAP—is factually similar to the charge that Kindred failed to disclose that it was not properly reserved against anticipated professional liability claims. At base, Plaintiffs' complaint centers around Defendants' statements that Kindred was performing well financially and was adequately reserved when, in fact, Kindred was poorly prepared to handle all of its liability claims, which then caused the stock price to drop when Kindred had to announce the $55 million charge. The Court will therefore only analyze these statements.

Plaintiffs' characterize Defendants' statements simultaneously as "false and misleading" assertions of fact and also as omissions. The Court finds that some of Defendants' statements are in fact omissions (i.e., Defendants actually failed to discuss the rise in Florida claims and the inadequacy of Kindred's reserves) and that Defendants' other statements are better characterized as misrepresentations (i.e., Defendants indicated that Kindred was doing well financially or that it had adequate reserves when, according to Plaintiffs, that was not truly the case). The Court will first consider the alleged omissions and then the alleged misrepresentations.

Florida law. As discussed *infra,* this provision applied only to those lawsuits filed after May 15, 2001, which would not affect the lawsuits filed under the old law, the litigation at issue in this case.

The Court will analyze the alleged misrepresentations and omissions separately in this opinion.

8. Plaintiffs also allege that Defendants made false and misleading statements when Edward Kuntz and Richard Lechleiter signed

**IV.**

Plaintiffs allege that Defendants failed to disclose the rise in claims and the inadequacy of company reserves for essentially all of Defendants' statements discussed in Plaintiffs' complaint.[8] The Court, however, finds that only the following three documents as described in Plaintiffs' complaint as attached to Defendants' motion actually omits this information:

(1) Form 10–Q for the quarter ending June 30, 2001: The form only listed the actual amount of money kept in Kindred's reserves as of June 30, 2001 ($113,829,000) and December 31, 2000 ($101,209,000). (Compl. ¶ 32; Defs. Ex. I)

(2) Form 10–Q for the quarter ending March 31, 2002: The form only listed the actual amount of money kept in Kindred's reserves as of March 31, 2002 ($136,325,000) and December 31, 2001 ($136,764,000). (Compl. ¶ 67; Defs. Ex. S)

(3) Form 10–Q for the quarter ending June 30, 2002: The form only listed the actual amount of money kept in Kindred's reserves as of June 30, 2002 ($148,516,000) and December 31, 2001 ($136,764,000). (Compl. ¶ 78; Defs. Ex. L)

■ In order to be liable for an omission of a material fact, "the defendant must have violated an affirmative duty of disclosure." *In re Sofamor Danek,* 123 F.3d at 400. The Sixth Circuit has distin-

and filed statements with the SEC confirming the accuracy of Kindred's 2001 Form 10–K and subsequent Form 10–Q filings in accordance with the Sarbanes–Oxley Act of 2002 and the SEC's June 2002 order (Compl.¶¶ 80, 81). The Court did not analyze these statements because they were just confirmations of other statements that the Court will review independently (*see infra* statements 2 and 3 in Part IV and statement 4 in Part V).

guished between "hard" and "soft" information in determining what kind of information a company must disclose to its investors. *See id.* at 401–02. "Hard information is typically historical information or other factual information that is objectively verifiable" while soft information "includes predictions and matters of opinion." *Id.* at 401 (internal quotation marks omitted). A company has a duty to disclose hard information but not soft information. *Id.* at 402. As the following discussion suggests, Plaintiffs cannot satisfy the first element of a 1934 Act fraud claim here because Defendants' omissions largely concerned "soft" information that Kindred was probably not required to disclose.

As to all alleged information, Kindred disclosed, if it knew of it. For instance, Plaintiffs claim that Defendants had notice of potential Florida claims to be filed under the old law because Florida law required a plaintiff to submit a notice of intent to file a medical malpractice suit 75 days in advance. Defendants correctly point out, however, that this provision of the tort reform legislation applied only to actions accruing *after* May 15, 2001, the

date the tort reform law went into effect. Fla. Stat. Ann. § 400.0233 (historical notes to statute state that the provision "is applicable to causes of action accruing on or after May 15, 2001"). Defendants therefore would not have received any notices of anticipated lawsuits for claims arising before May 15, 2001, which, assuming Defendants incurred $25 million in liability for 2001 claims, are probably at least one-quarter to one-third of the claims at issue. On the other hand, Defendants presumably could keep track of the Florida lawsuits accruing before May 15, 2001 that were actually filed before the October 5, 2001 deadline. If known, these would be "objectively verifiable" facts subject to disclosure.[9]

The "hard" facts about the actual amounts reserved for future claims certainly were subject to disclosure. In fact, Kindred did disclose this information to investors. In all three Form 10–Q filings discussed above, Kindred listed the current amounts reserved for liabilities. In the Form 10–Q for the third quarter of 2001, Kindred listed its reserves at $117,-937,000 [10] as of September 30, 2001. By

9. In fact, although they did not mention it in the Form 10–Q filings listed above, Defendants disclosed in other SEC documents that Kindred faced a potential increase in liability claims from Florida. In the company Prospectus filed with the SEC on November 7, 2001 and the Form 10–K for fiscal year 2001, Kindred specifically informed investors that "[s]ignificant legal actions, particularly in the State of Florida, could subject [Kindred] to ... substantial uninsured liabilities, which could materially and adversely affect [Kindred's] liquidity, financial condition and results of operations." The Prospectus and the Form 10–K also stated that Kindred has "experienced substantial increases in both the number and size of patient care liability claims" and that "plaintiffs' attorneys increasingly are seeking significant punitive damages and attorney's fees," all of which meant that "general and professional liability costs have become increasingly expensive and unpredictable." Kindred further explained in specific

terms the company's operations in Florida, the increasing costs for professional liability insurance in Florida, and details about the tort reform legislation passed there. Kindred, however, was "unable to determine what impact, if any, [the new] legislation [might] have on [Kindred's] claims experience in Florida." Thus, although Kindred anticipated a flurry of claims filed before the October 5, 2001 deadline, it could not predict the effect of this potential increase in lawsuits. For instance, Kindred presumably would benefit from the legislation's limitations on punitive damages as to claims occurring after May 15, 2001. Even though this information might be considered "soft" because it involved a prediction of future events, Kindred duly disclosed its uncertainty.

10. The Court notes a discrepancy between numbers given by Defendants and Plaintiffs for reserves as of September 30, 2001. In

their very nature, reserve levels are projections of future events and results. Reserves attributable to an individual case may change as the extent of liability becomes clearer. With the discovery of a single fact, the reserve for a case could increase many times over, or be reduced to mere nuisance value. When the liability is paid or the claim dismissed, the reserve is extinguished entirely. The overall reserve level is therefore a constantly changing accumulation of numbers and processes. Accordingly, Kindred revised its reserve figures every quarter. Overall, Kindred's reserves increased approximately 47% between December 2000 and June 2002.[11]

Finally, Kindred investors would also have been aware of Kindred's change in insurance coverage and its possible effect on the company's liability. Although it did not discuss the insurance change in the three Form 10–Q filings mentioned here, Kindred disclosed the change in its insurance policy in its November 2001 Prospectus and the Form 10–K for fiscal year 2001. After November 30, 2000, Kindred was exposed to greater liability in Florida since excess coverage above the $40 million aggregate was no longer available. In the November 2001 Prospectus and the 2001 Form 10–K, Kindred explained its insurance arrangements through Cornerstone and unaffiliated commercial insurance companies and also disclosed that, after November 30, 2000, Kindred would no longer have "the benefit of any aggregate coverage limit through unaffiliated commercial insurance carriers." Kindred also explained that, even though management believed that Kindred maintained insurance sufficient to cover its operations, its "insurance coverage might not cover all claims against [Kindred] or continue to be available . . . at a reasonable cost." As a result, Kindred might "be exposed to substantial liabilities" if the company could not maintain adequate insurance coverage. These statements likewise put investors on notice that the change in insurance coverage along with increased legal claims might strain the company's financial health.

Because Plaintiffs fail to satisfy the first element of their fraud claim as to Defendants' alleged omissions, the Court need not analyze the scienter element. Plaintiffs' fraud claim as to these statements is therefore dismissed.

## V.

Most of Defendants' statements are misrepresentations, and Plaintiffs' claim as to these statements largely fails because a majority of them are protected under the

---

their motion to dismiss, Defendants list reserves as of September 30, 2001 at $117,973,000 while Plaintiffs list reserves at $117,937,000 in their complaint. No documentation was provided to verify which number is correct. While the discrepancy is rather minor, the Court uses the Plaintiffs' number here.

11. While company management believed that the liability reserves were adequate, Kindred stated in the Form 10–K for fiscal year 2001 that reserve levels were determined according to "independent actuarially determined estimates" and based upon past experience with reported and unreported claims. Kindred also explained that "[t]he methods used in determining these liabilities are continually reviewed and any adjustments are currently reflected in earnings." Kindred likewise informed its investors that "[t]hese liabilities are necessarily based on estimates and . . . the ultimate liability may be in excess of or less than the amounts recorded." Investors would therefore have been aware of the amount Kindred set aside in its reserves and potential changes to these levels if Kindred determined that they were not sufficient to cover estimated claims. Thus, Kindred disclosed the potential significance of the claims against it and the inherent difficulties in trying to predict or measure them accurately.

PSLRA "safe harbor" provision for forward-looking statements. Plaintiffs allege that the following statements were false and misleading:

(1) From the August 14, 2001 Press Release about restatement of reserves: Kindred announced that it had understated its reserves for professional liability claims by approximately $39 million. (Compl.¶ 29)

(2) From the August 14, 2001 Press Release about operating results for the quarter ending June 30, 2001: "[W]e have the financial flexibility to successfully execute our strategic operating plan . . . ." (Compl.¶ 31)

(3) From the August 23, 2001 Legg Mason Report: "[T]he expectation of Kindred's management is that current reserves are adequate and there is some potential for upside from reduced liability accruals now that tort reform in Florida has been enacted." (Compl.¶ 34) [12]

(4) From the November 2001 Prospectus and 2001 Form 10–K: "We maintain general liability insurance and professional malpractice liability insurance in amounts and with deductibles that management believes are sufficient for our operations." (Compl.¶¶ 37, 56)

(5) From November 14, 2001 Form 10–Q for the quarter ending September 30, 2001: "Management believes that the financial information included herein reflects all adjustments necessary for a fair presentation of interim results . . . ." (Compl.¶ 44)

(6) From the November 14, 2001 Lehman Brothers Report: Analysts listed Kindred stock as a "strong buy." (Compl.¶ 45)

(7) From the November 15, 2001 J.P. Morgan Report: Analysts noted "the problems with rising professional liability costs in Florida but stated that 'given the projected top-line growth for Kindred and the potential benefits from these state Tort reform bills, this cost could become less of an issue in 2002.'" (Compl.¶ 46)

(8) From the February 5, 2002 Press Release: "I [Edward Kuntz] am proud of our organization and the strategic and operational accomplishments we achieved in 2001 . . . . The successful reorganization of the Company, the improvement in our operating results, the $149 million of debt pay-downs made after our emergence from bankruptcy and the equity offering we completed in the fourth quarter all served to solidify the Company's financial position and create a platform from which we can grow. . . . [N]et income [for 2002] may range between $63 million to $68 million." (Compl.¶¶ 49–50)

(9) From the February 6, 2002 *Courier–Journal* Article: "We think we'll continue to make progress next year. . . . [W]e're expecting a very good year." (Compl.¶ 51)

(10) From the April 2, 2002 UBS Warburg Report: "Kindred had a 'strong balance sheet post-emergence from bankruptcy.'" (Compl.¶ 57)

(11) From the April 9, 2002 Lehman Brothers Report: Analysts rated Kindred a "strong buy" and noted "that Kindred's revenue growth was better than expected in both operating divisions." (Compl.¶ 57)

---

12. The Court notes a discrepancy in dates listed on the Legg Mason analyst report (Defs.Ex. M) and in Plaintiffs' complaint. The actual report states that it was issued on September 25, 2001, and Plaintiffs state that the report was issued on August 23, 2001.

(12) From the April 16, 2002 Press Release: "Our first quarter results met our expectations, with both divisions reporting solid improvements in their operations.... The Company also reaffirmed its previous guidance for the full fiscal year [of 2002], estimating net income of $63 million to $68 million." (Compl.¶¶ 60–61)

(13) From the April 17, 2002 Conference Call: "Management continues to expect 2002 net income of $63–68 million.... Management stated that its guidance was conservative." (Compl.¶ 62)

(14) From the April 22, 2002 Lehman Brothers Report: "Feinstein at Lehman Brothers issued a report on Kindred based upon, and repeating defendants' statements during the April 17, 2002 conference call, including that revenue growth was better than expected in both operating divisions, beating analyst estimates. Lehman Brothers also repeated defendants' false statements that Kindred would obtain 2002 net income of $63–$68 million." (Compl.¶ 64)

(15) From the April 23, 2002 Lehman Brothers Report: Analysts noted "that Kindred reaffirmed 2002 guidance on a first quarter analyst conference call, and emphasized that this guidance was 'conservative.'" (Compl.¶ 65)

(16) From the July 29, 2002 Press Release: "Our second quarter operating results met our expectations, reflecting progress in both of our operating divisions .... We are continuing to pursue development opportunities to expand in markets where we believe we can provide quality services and benefit from economies of scale.... The strength of our operating cash flows enabled us to improve our liquidity during the second quarter.... The Company also updated its previous operating guidance for the full fiscal year [of 2002], estimating ... net income ... should range from $63 million to $68 million." (Compl.¶¶ 70–73)

(17) From the July 30, 2002 Conference Call: "Management believed that Kindred adequately recorded reserves for professional liability. Management reviews malpractice insurance cost accruals monthly, and engaged independent actuaries to evaluate liability costs and claims reserves on a quarterly basis. Management confirmed that they were comfortable with Kindred's numbers for professional liability." (Compl.¶ 74)

(18) From the July 31, 2002 Lehman Brothers Report: "The company goes through a quarterly review process with its actuaries to ensure that it is accruing at the correct amount and indicated that it was currently comfortable with its reserves." (Compl.¶ 75)

(19) From the July 31, 2002 UBS Warburg Report: "The company review[s] its accruals on a monthly basis, and unlike Beverly, which conducts a full actuarial review semi-annually, Kindred's independent actuaries ... conduct a full review and calculation on a quarterly basis .... Any adjustments deemed to be necessary to increase the value of the reserves are then taken at that time .... Management believes that constant monitoring of this strategy will reduce volatility in earnings by preventing the need for large unusual charges to 'catch up' reserves, thus enabling it to avoid the situation recently experienced at Beverly. Furthermore, based on its actuaries' most recent quarterly review,

Kindred believes that it is appropriately reserved for professional liability ....." (Compl. ¶ 76)

## A.

■ The Court may first dispense with three analyst reports identified in statements 6, 10 and 11. In order to establish liability for third-party statements, "Plaintiffs must identify the date and the analyst and must detail the conversations with 'specific' defendants." *In re Humana Inc. Sec. Litig.*, No. 3:99–CV–0398–S, 2000 U.S. Dist. LEXIS 21671, at *23 (W.D.Ky. Nov. 7, 2000) [hereinafter *In re Humana*]. Plaintiffs' allegations concerning analyst statements 6, 10, and 11 fail for the following reasons: [13] (1) Plaintiffs do not identify any specific Defendants with whom the analyst spoke or the date of the conversations for the April 9, 2002 report by Lehman Brothers; and (2) Plaintiffs do not identify the specific analyst, the Defendants with whom the analyst spoke, or the date of the conversations for the November 14, 2001 report by Lehman Brothers or the April 2, 2002 report by UBS Warburg. *See id.*

## B.

The Court must review statements 2–4, 7–9, and 12–19, which include a few of the analyst reports discussed *supra*, to determine whether they are protected under the PSLRA "safe harbor" provision. Under the "safe harbor" provision, one who makes a forward-looking statement is pro-

tected from liability for fraud if either: (1) the statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) "the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1). If the statements are accompanied by meaningful cautionary language, then the scienter requirement becomes irrelevant. *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir.2003). But if the statements are not accompanied by appropriate cautionary language, then the defendant could be liable if the plaintiff can show actual knowledge. *Id.* The PSLRA defines a "forward-looking statement" as "a statement containing a projection of revenues, income ..., earnings ... per share, ... or other financial items," "a statement of the plans and objectives of management for future operations," "a statement of future economic performance," or "any statement of the assumptions underlying or relating to" any of the above. 15 U.S.C. § 78u–5(i)(1)(A)–(D).

■ Statements 2, 7–9, and 12–16 "appear to be classically forward-looking." *See Miller*, 346 F.3d at 677. They relate management's expectations for the company's future operations and its projections of revenues and "future economic performance," all of which are inherently forward-looking statements under the PSLRA.

---

13. With the exception of the April 22, 2002 report by Lehman Brothers (*see supra* statement 14), for which Plaintiffs did identify all three elements, all of the other analyst statements (*see supra* statements 3, 7, 15, 18, and 19), which the Court treats as forward-looking statements, also fail: (1) Plaintiffs do not identify any specific Defendants with whom the analyst spoke or the date of the conversations for the August 23, 2001 report by Legg

Mason or the November 15, 2001 report by J.P. Morgan; (2) Plaintiffs do not identify the specific analyst, the Defendants with whom the analyst spoke, or the date of the conversations for the July 31, 2002 report by Lehman Brothers; and (3) Plaintiffs do not identify the specific analyst for the April 23, 2002 report by Lehman Brothers or the July 31, 2002 report by UBS Warburg. *See In re Humana*, 2000 U.S. Dist. LEXIS 21671, at *23.

738

When management speaks of a "strategic operating plan," it is talking about what it is looking forward to accomplishing for the company in the future. When management says it is "expecting a very good year" and guesses what the company's net income will be for that fiscal year before the year is over, it is discussing what it projects the company will make in revenues. All of these statements are about future events and therefore forward-looking as defined in the PSLRA.

■ The remaining statements, numbered 3–4 and 17–19, do contain assertions about present facts, namely that management believed at the time the statements were made that Kindred's current reserves and liability coverage were adequate. These statements, however, were predicated on projections of future events. The amount Kindred keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience based on past claims history as well as current filings. Assertions about the adequacy of Kindred's reserves could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA. *See Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir.1999) ("[A] statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance.... While it is true that the *state* of [a company's] 'fundamental business' and 'underlying strategies' is a question of present condition, whether they are intact is a fact only verifiable by seeing how they hold up in the future.").

Thus, all of these statements must be considered forward-looking under the PSLRA.

1.

Statements 2, 4, 8, 12, and 16 are protected under the PSLRA because they were accompanied by meaningful cautionary language. "[C]autionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements ...." *Helwig*, 251 F.3d at 558–59 (quoting H.R. Conf. Rep. No. 104–369, at 43 (1995)) (internal quotation marks omitted). Boilerplate statements are not sufficient. *Id.* at 558.

■ In Kindred's November 2001 Prospectus and its 2001 Form 10–K (*see supra* statement 4), the company specifically warned investors about the change in its insurance coverage scheme and the lack of excess coverage above a specified aggregate for Florida claims. It further explained that, because of these changes, "[its] insurance coverage might not cover all claims against [Kindred] or continue to be available to [Kindred] at a reasonable cost" and that "[i]f we are unable to maintain adequate insurance coverage or are required to pay punitive damages, [Kindred] may be exposed to substantial liabilities." The cautionary language used here gave investors particular information about the effect the insurance coverage change could have on Kindred's financial health and thus provided the public with a "meaningful" warning within the meaning of the PSLRA.

■ Similarly, press releases issued by Kindred on August 14, 2001, February 5, 2002, April 16, 2002, and July 29, 2002 (*see supra* statements 2, 8, 12, and 16) also gave investors specific warnings that forward-looking statements in the press releases were "inherently uncertain" and that "stockholders and other potential investors must recognize that actual results

may differ materially from the Company's expectations as a result of a variety of factors ...." The press releases listed approximately a dozen specific factors beyond the company's control that might affect Kindred's business expectations, including "the increase in the costs of defending and insuring against alleged patient care liability claims."

The Court recognizes that Kindred used much of the same cautionary language in all four press releases. Plaintiffs refer to the language as merely "boilerplate" warnings. The Court disagrees. Simply because language is repeated does not classify it as "boilerplate." The list of factors that Kindred provided was "detailed and informative." *Harris*, 182 F.3d at 807. It gave the investor specific information about "what kind of misfortunes could befall the company and what the effect could be." *Id.* These warnings specifically admonished investors about the actual risks that Kindred faced. The warnings provided enough specific information to be informative and helpful, rather than so general as to obscure real risks. Considering these circumstances, the Court concludes that the warnings were "meaningful." For statements 2, 4, 8, 12, and 16, then, scienter would be irrelevant.

### 2.

The remaining forward-looking statements 3, 7, 9, 13–15, and 17–19 do not appear from the complaint to be accompanied by any cautionary language. The stock analyst reports from Legg Mason, J.P. Morgan, Lehman Brothers, and UBS Warburg (*see supra* statements 3, 7, 14–15, and 18–19) do not state any warnings that Kindred management might have offered in the analysts' conversations with them. Plaintiffs' complaint likewise does not offer any cautionary language from the *Courier–Journal* article dated February 6, 2002 (*see supra* statement 9) that Kindred man-

agement might have used with the journalist reporting that particular story. And, as they are reported in Plaintiffs' complaint, the statements made by Kindred management during the conference calls with analysts, money managers, institutional investors, and large Kindred shareholders on April 17, 2002 and July 30, 2002 (*see supra* statements 13 and 17) similarly do not show that company officers used any cautionary language during the call when making their predictions about Kindred's performance. Furthermore, the statements made during these conference calls were oral and thus subject to the slightly stricter requirements under the PSLRA related to oral forward-looking statements. *See* 15 U.S.C. § 78u–5(c)(2).

Consequently, Defendants can only avail themselves of the "safe harbor" provision if Plaintiffs fail to show actual knowledge for the remaining forward-looking statements. And Plaintiffs have failed to meet their burden. Scienter, the second element of a 1934 Act claim, means a "mental state embracing intent to deceive, manipulate or defraud." *In re Comshare*, 183 F.3d at 548 (internal quotation marks omitted) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The requisite scienter for forward-looking statements is actual knowledge. *Miller*, 346 F.3d at 672.

The Sixth Circuit has found the following factors to be relevant in alleging scienter in securities fraud actions: (1) insider trading at a suspicious time or in an unusual amount; (2) different internal reports and external statements on the same subject; (3) proximity in time of an allegedly false statement or omission and a later disclosure of inconsistent information; (4) evidence of bribery; (5) existence of a separate fraud action and the company's rapid settlement of that suit; (6) disregard of the most current factual information

before making statements; (7) accounting reports that require sophisticated knowledge to understand any negative implications; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) motivation by the defendants to preserve their salaries or jobs. *Id.* (citing *Helwig*, 251 F.3d at 552). Facts showing motive and opportunity may "rise to the level of creating a strong inference of reckless or knowing conduct, [but] the bare pleading of motive and opportunity" is not sufficient to allege scienter. *In re Comshare*, 183 F.3d at 551.

■■■ Plaintiffs allege the following facts to show scienter on the part of Defendants: (1) that the individual Defendants "had access to the adverse non-public information" about Kindred's financial situation through internal documents, reports, and meetings and access to confidential proprietary information about the company; (2) that Defendants had advance notice of the lawsuits to be filed because of the 75–day notice provision under Florida law and knew about the change in insurance coverage for Florida claims; (3) that Defendants were able to access financial information about Kindred at all times because of "industry-leading information technology" systems in place at Kindred; and (4) that the individual Defendants had motive to commit fraud because they sold some of their own shares in the secondary offering on November 14, 2001 and because they received performance-based compensation bonuses. These factors, neither individually nor collectively, create a strong inference that Defendants had actual knowledge that their forward-looking statements regarding the adequacy of Kindred's reserves and its satisfactory financial health were false.

First, like the officers and directors of every other company, Defendants have ac-cess to internal documents and proprietary information as a matter of course in their jobs. Access to sensitive financial information by itself does not permit an inference that Defendants knew that their reserves were insufficient to cover potential professional liability claims. Similarly, having access to financial data through sophisticated information technology does not mean that Defendants could predict the future or that they knew what they were telling the public was false. The inference is particularly weak because the supposed information concerns a prediction about future events rather than a known present fact. Plaintiffs do not allege any discrepancy between the information known to company management and that presented to the public or made available to its actuaries. Plaintiffs present no evidence that Defendants withheld opinions of their actuaries that Kindred's reserves were inadequate. *Cf. Helwig*, 251 F.3d at 546, 557–58 (plaintiffs showed "strong inference" that defendants had actual knowledge where defendants stated publicly that they could not assess impact of federal legislation on revenue yet had told employees a few months before that layoffs and "tough times" would be expected because of new law). Even though Defendants might have made some poor guesses, Plaintiffs do not show that the data and the methodology upon which Defendants relied for risk estimates were not sound.

Second, as the Court stated *supra*, Plaintiffs misinterpret Florida's 75–day notice provision. That provision applied only to causes of action accruing after May 15, 2001. Defendants would not have had the benefit of notice for claims accruing prior to May 15 and filed by October 5, 2001. A significant portion of Kindred's increased exposure is related to these cases. Plaintiffs therefore cannot rely on this fact. In

addition, Plaintiffs cannot rely on the change in Kindred's insurance scheme after November 30, 2000 to show actual knowledge. While Kindred may have faced potential increased liability when its excess coverage above $40 million in the aggregate no longer applied to Florida claims, it admitted as much to its investors and expressed its uncertainty concerning the effect such a change might have on Kindred's financial performance. Plaintiffs do not allege that Defendants did not properly take into account the change in Kindred's insurance coverage when estimating how much was needed in its reserves.

Third, Defendants' sale of their stock on November 14, 2001 does not suggest fraudulent intent in these circumstances. The stock sale was fully eleven months before Kindred's announcement on October 10, 2002 that the company would take a charge of $55 million to cover liability risks. Sale of stock almost a year before the October 2002 announcement is not "suspicious." [14] Well over half of the potential loss announced later by Kindred had yet to occur. In addition, Defendants sold only a small portion of their total shares. Even assuming that Plaintiffs' calculations as to the percentage of shares actually sold are correct, Defendants still retained over 80% of their total shares and collectively lost over $200 million during the class period when Kindred's stock value dropped. Such activity on the part of Defendants does not raise suspicion that they were "dumping" any stock to protect their investments. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter.").

Fourth, Defendants' financial bonuses do not raise a strong inference of actual knowledge. Plaintiffs offer generic allegations about motive here that "are based upon scenarios which are quite common in the world of corporations." *In re Humana*, 2000 U.S. Dist. LEXIS 21671, at *19. Alleging scienter based upon the fact that individual Defendants received bonuses linked to company performance would raise a strong inference "that most executives commit securities fraud." *Id.* Plaintiffs' allegations about the stock sale and Defendants' bonuses represent only a "bare pleading of motive and opportunity," which are not sufficient to show scienter. *In re Comshare*, 183 F.3d at 551.

### C.

Only two alleged misrepresentations remain: Kindred's August 14, 2001 press release concerning the restatement of its reserves (*see supra* statement 1) and Kindred's Form 10–Q for the quarter ending September 30, 2001 (*see supra* statement 5). The statements in these documents relate to present or historical facts. The requisite scienter for such statements is recklessness. *Miller*, 346 F.3d at 672. The Sixth Circuit has defined "recklessness" for the purposes of showing scienter as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care" and for which the danger "must at least be so obvious that any reasonable man would have known of it." *In re Comshare*, 183 F.3d at 550 (quoting *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir.1979)) (internal quotation marks omitted); *see also Booth v. Verity, Inc.*, 124 F.Supp.2d 452, 461–62 (W.D.Ky.2000). "[B]are pleading of motive and opportunity" is not sufficient. *In re Comshare*, 183 F.3d at 551.

---

**14.** Plaintiffs' theory would be that, in November 2001, Defendants knew that the predic- tion of reserves would dramatically increase the following year.

For the same reasons expressed above in relation to Defendants' forward-looking statements, the Court concludes that Plaintiffs have failed to create a strong inference that Defendants acted recklessly in making these alleged misrepresentations. In these statements, Defendants are informing their investors about the understatement of Kindred's reserves and telling investors that they are receiving accurate information. Defendants' access to internal financial documents and sensitive proprietary information, the November 14, 2001 stock sale, and their financial bonuses do not show "highly unreasonable conduct" on Defendants' behalf that leads the Court to believe they acted recklessly. None of these activities raises any suspicion that Defendants would have known that their estimates about Kindred's reserves were too low.

Plaintiffs have failed to show fraud on the part of Defendants for any of their alleged misrepresentations. Plaintiffs' claim as to these statements is therefore dismissed.

## VI.

■ Liability of a "controlling person" is derivative, and a "controlling person" can therefore only be liable when the entity he or she is controlling has violated securities laws. *In re Comshare*, 183 F.3d at 554 n. 11 (citing *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983)). Accordingly, individual Defendants cannot be held jointly and severally liable for securities fraud as "controlling persons" under § 20(a) of the 1934 Act (15 U.S.C. § 78t(a)) since Kindred, the entity they were allegedly controlling, has not committed securities fraud. Plaintiffs' claim against them is likewise dismissed.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Defendants Kindred Healthcare, Inc., Edward L. Kuntz, Richard A. Schweinhart, David A. Tepper, Paul J. Diaz, and Richard Lechleiter have moved, under Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss Plaintiffs' complaint for securities fraud under §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 and securities regulation, 17 C.F.R. § 240.10b–5. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion to dismiss is SUSTAINED and Plaintiffs' complaint is DISMISSED WITH PREJUDICE.

This is a final and appealable order.